# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE UNITED STATES OF AMERICA; and COMMODITY FUTURES TRADING COMMISSION, | |
| *Plaintiffs*, | |
| v. | |
| STATE OF CONNECTICUT; NED LAMONT, in his official capacity as Governor of Connecticut; WILLIAM TONG, in his official capacity as Attorney General of Connecticut; BRYAN CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION, GAMING DIVISION; and KRISTOFER GILMAN, in his official capacity as Director of the Gaming Division of the Connecticut Department of Consumer Protection, | Case No. 3:26-cv-498-VDO |
| *Defendants*, | |
| v. | |
| MOHEGAN TRIBE OF INDIANS OF CONNECTICUT and MASHANTUCKET PEQUOT TRIBAL NATION, | |
| *Proposed Intervenors-Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO INTERVENE BY MOHEGAN TRIBE OF INDIANS OF CONNECTICUT AND MASHANTUCKET PEQUOT TRIBAL NATION**

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 3

    A.    The Tribes Offer Class III Gaming Under the Indian Gaming Regulatory Act and Connecticut Law..................................................................................... 3

    B.    Prediction Markets Offer Sports Betting in Violation of Connecticut Law and IGRA ................................................................................................... 6

    C.    Procedural History .................................................................................. 10

ARGUMENT................................................................................................................. 11

I.    The Tribes Are Entitled to Intervene as of Right Under Rule 24(a)................................ 11

    A.    The Tribes' Motion is Timely................................................................... 11

    B.    The Tribes Have a Substantial Interest in the Outcome of This Litigation. ......... 13

    C.    The Disposition of This Action Could Impair the Tribes' Interests. .................... 15

    D.    The Existing Parties Do Not Adequately Represent the Tribes' Interests............ 16

II.    Alternatively, the Tribes Should Be Permitted to Intervene Under Rule 24(b)................ 18

CONCLUSION.............................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allco Fin. Ltd. v. Etsy,*
  300 F.R.D. 83 (D. Conn. 2014)......................................................................................12, 15

*Arizona v. California,*
  460 U.S. 605 (1983)..............................................................................................................19

*Ass'n of Conn. Lobbyists LLC v. Garfield,*
  241 F.R.D. 100 (D. Conn. 2007)..........................................................................................18

*Berger v. N.C. State Conference of the NAACP,*
  597 U.S. 179 (2022)........................................................................................................15, 17

*Brennan v. N.Y.C. Bd. of Educ.,*
  260 F.3d 123 (2d Cir. 2001)..................................................................................................17

*Forest Cnty. Potawatomi Cmty. v. United States,*
  317 F.R.D. 6 (D.D.C. 2016)............................................................................................16, 17

*Gameroom Superstores, LLC v. Brodsky,*
  2013 WL 3701909 (M.D. Fla. July 12, 2013) ......................................................................16

*Glacier Cnty. Reg'l Port Authority v. Esau,*
  2022 WL 16948623 (D. Mont. Nov. 15, 2022) ....................................................................16

*Ho-Chunk Nation v. Kalshi, Inc.,*
  2026 WL 1284077 (W.D. Wis. May 11, 2026) ....................................................................17

*Mashantucket Pequot Tribe v. Connecticut,*
  913 F.2d 1024 (2d Cir. 1990)..................................................................................................3

*MasterCard Int'l, Inc. v. Visa Int'l Serv. Ass'n, Inc.,*
  471 F.3d 377 (2d Cir. 2006)..................................................................................................11

*Maverick Gaming LLC v. United States,*
  123 F.4th 960 (9th Cir. 2024) ........................................................................................13, 16

*Maverick Gaming LLC v. United States,*
  658 F. Supp. 3d 966 (W.D. Wash. 2023)..............................................................................15

*MGM Global Resorts Dev., LLC v. U.S. Dep't of the Interior,*
  2020 WL 5545496 (D.D.C. Sept. 16, 2020) ...................................................................14, 15

ii

*Michigan v. Bay Mills Indian Cmty.*,
    572 U.S. 782 (2014)............................................................................................3

*Montgomery v. Seminole Hard Rock Digital, LLC*,
    2025 WL 448936 (M.D. Fla. Feb. 10, 2025) ...................................................13

*N. Am. Derivatives Exchange, Inc. v. Nevada*,
    2025 WL 4670470 (D. Nev. Sept. 9, 2025)....................................................14, 17, 18

*In re N.Y.C. Policing During Summer 2020 Demonstrations*,
    27 F.4th 792 (2d Cir. 2022) ...........................................................................11, 12, 15

*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*,
    331 F.R.D. 5 (D.D.C. 2019)............................................................................14, 15, 18

*Schaghticoke Tribal Nation v. Norton*,
    2006 WL 1752384 (D. Conn. June 14, 2006).................................................12, 17, 18, 19

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972).........................................................................................15

*U.S. Postal Serv. v. Brennan*,
    579 F.2d 188 (2d Cir. 1978).............................................................................18

*United States v. Palermino*,
    238 F.R.D. 118 (D. Conn. 2006)......................................................................12, 17

*W. Flagler Assocs. v. Haaland*,
    71 F.4th 1059 (D.C. Cir. 2023).........................................................................3

**Statutes**

25 U.S.C. § 2701....................................................................................................3

25 U.S.C. § 2702....................................................................................................1, 3, 7

25 U.S.C. § 2703....................................................................................................4

25 U.S.C. § 2710....................................................................................................4, 7, 13

Conn. Gen. Stat. § 12-850.....................................................................................10

Conn. Gen. Stat. § 12-851.....................................................................................5

Conn. Gen. Stat. § 12-852.....................................................................................5

Conn. Gen. Stat. § 12-863.....................................................................................10

Conn. Gen. Stat. § 53-278b...................................................................................6, 9

Conn. Gen. Stat. § 53-278d.........................................................................................9

**Regulations**

25 C.F.R. § 502.4 ......................................................................................................3

**Other Authorities**

American Gaming Ass'n, *Gaming Regulations and Statutory Requirements: Connecticut* (2026).............................................................................................14

American Gaming Ass'n, *State of the States 2026* (May 2026) .....................................6

Ingi Thor Arngrimsson, *Connecticut's Sports Betting Success Comes with a Catch*, iGamingToday (Jan. 23, 2026)...........................................................................6

Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025) ...........................................................8

*Comments of the Mohegan Tribe on Commodity Futures Trading Commission Advance Notice of Proposed Rulemaking, Prediction Markets*, RIN 3038-AF65 (Apr. 29, 2026) .................................................................................8

Commodity Futures Trading Commission, *CFTC's Review of Nadex Sports Contract Submissions* (Jan. 14, 2025)...............................................................................7

*FanDuel Announces Market Access Partnership with Mohegan Gaming & Entertainment to Operate Sports Betting, iGaming and DFS in Connecticut* (July 7, 2021) ...............................................................................................................6

*Foxwoods and DraftKings Launch Online Sports Betting and iGaming in Connecticut* (Oct. 19, 2021)..................................................................................6

Dustin Gouker, *Kalshi's Recent Volume Growth Comes From Parlays*, Event Horizon (May 6, 2026) ............................................................................................7

Indian Gaming, 59 Fed. Reg. 65,130 (Dec. 16, 1994) .............................................................................4

Indian Gaming; Amendment to Class III Gaming Procedures for the Mashantucket Pequot Tribe, 84 Fed. Reg. 11,122 (Mar. 25, 2019)..........................................................................4

Indian Gaming; Approval of Tribal-State Class III Gaming Compact in the State of Connecticut, 86 Fed. Reg. 51,369 (Sept. 15, 2021) .........................................................................5

Indian Gaming; Opportunity to Comment on Mashantucket Pequot Gaming
  Procedures,
  56 Fed. Reg. 15,746 (Apr. 17, 1991) .......................................................................4

Indian Gaming; Tribal-State Class III Gaming Compact Taking Effect in the State
  of Connecticut,
  83 Fed. Reg. 25,484 (June 1, 2018) .......................................................................4

Letter from Bryan Newland, Assistant Secretary, Indian Affairs, to Rodney
  Butler, Chairman, Mashantucket Pequot Tribal Nation (Sept. 10, 2021) ..........................5, 14

Mashantucket Pequot Gaming Procedures ....................................................................5

Notice of Final Mashantucket Pequot Gaming Procedures,
  56 Fed. Reg. 24,996 (May 31, 1991) .......................................................................4

Tribal-State Compact Between the Mohegan Tribe and the State of Connecticut ..........................5

**INTRODUCTION**

The United States of America and the Commodity Futures Trading Commission ("CFTC") (together "Plaintiffs" or the "Federal Government") ask this Court to provide the CFTC with sweeping and novel authority that Congress has never authorized: the right to serve as the nationwide regulatory body for sports betting. For the Mohegan Tribe of Indians of Connecticut ("Mohegan Tribe") and the Mashantucket Pequot Tribal Nation ("Pequot Tribe") (collectively, the "Tribes"), this is not an abstract question of regulatory jurisdiction—it is a direct threat to their sovereign authority and their governmental and economic interests. The Tribes' right to regulate and operate gaming is not incidental; it is the product of federal law, sovereign government-to-government agreements, state law, and decades of investment designed to promote tribal self-sufficiency and strong tribal governments.

The Tribes have two interests directly implicated by this lawsuit. The first is their sovereign authority to regulate all gaming activity on their Indian lands. In the Indian Gaming Regulatory Act ("IGRA"), Congress recognized that tribes have "the exclusive right to regulate gaming activity on Indian lands." 25 U.S.C. § 2701(5). Such exclusivity was designed to ensure that tribes—not third parties—would control gaming and benefit from its economic returns. *See* 25 U.S.C. § 2702(1)-(2). Consistent with the Tribes' sovereign interest in gaming on Indian lands, the Tribes and the State of Connecticut have worked together to build a comprehensive system for the regulation of lawful gaming—including online sports wagering—through negotiated compacts and procedures approved by the Secretary of the Interior. That system reflects a deliberate balance struck by Congress: it channels gaming activity into regulated avenues, secures substantial revenue for tribal governmental purposes, and advances core sovereign interests. The Federal Government's position in this litigation, however, would upend that balance by aiding unlicensed

1

entities in offering sports betting on Indian lands and in Connecticut. That outcome would undermine the Tribes' sovereignty, harm their governmental and economic interests, and conflict with the comprehensive regulatory framework established by IGRA.

The Tribes also have a governmental interest in gaming off of Indian lands in Connecticut. Pursuant to federally approved agreements with the State and provisions of Connecticut law, the Tribes operate online sportsbooks throughout Connecticut. Were the Federal Government to prevail in this litigation, the result would, at a minimum, significantly alter the Tribes' settled expectations and bargained-for arrangement about how online sports betting may be offered across Connecticut. At worst, the CFTC would become the *exclusive* regulator of sports betting, which would effectively nullify the current, well-established legal framework that has governed gaming activity in Connecticut for more than three decades. The Tribes thus have a direct and concrete stake in the outcome of this litigation even apart from the IGRA framework that governs on-reservation gaming. Because the Tribes' off-reservation gaming is governed in large part by the state laws the Federal Government seeks to preempt, the Tribes have a direct stake in the legal issues presented by this lawsuit.

Indeed, the Tribes are *already* being harmed by the Federal Government's position. Prediction markets are currently offering wagers in Connecticut that amount to traditional sports betting in all material respects, thereby violating IGRA, Connecticut's gaming laws, and the Tribes' gaming ordinances and procedures. Yet the Federal Government asserts that these wagers can be regulated only by the CFTC and are effectively immune from the laws governing every other gaming operator in the State. If that position prevails, the Tribes will face gaming activity from the prediction markets that violates IGRA, erodes the Tribes' exclusivity, diminishes the

value of their bargained-for rights, and threatens the financial engine that supports essential governmental services.

The Tribes cannot rely on the existing parties to protect their distinct sovereign and economic interests.  The Federal Government has taken a position directly contrary to the Tribes' interests.  The State's focus is on its own sovereign regulatory authority.  Neither party speaks for the Tribes' federally recognized rights under IGRA or the unique governmental and economic harms they face.

Rule 24 exists precisely for this circumstance, and the Tribes satisfy all of its requirements.  The Tribes' motion is timely, and the Tribes are prepared to adhere to any schedule the Court may set.  This action threatens the Tribes' core interests, and because no existing party adequately represents those interests, the Tribes are entitled to intervene as of right—or, at a minimum, should be granted permissive intervention—to ensure that their voice is heard before those interests could be irrevocably harmed.

The Tribes have conferred with the parties and are authorized to state that Defendants consent to the Tribes' motion to intervene, and Plaintiffs oppose the Tribes' motion.

## BACKGROUND

### A.    The Tribes Offer Class III Gaming Under the Indian Gaming Regulatory Act and Connecticut Law

In 1988, Congress enacted IGRA "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  Pub. L. No. 100-497, § 3, 102 Stat. 2467 (1988) (codified at 25 U.S.C. § 2702(1)).  Congress did so, in part, because it recognized that "existing Federal law d[id] not provide clear standards or regulations for the conduct of gaming on Indian lands."  25 U.S.C. § 2701(3).  IGRA thus makes clear that tribes have "the exclusive right to regulate gaming activity

3

on Indian lands."  25 U.S.C. § 2701(5); *see Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1029 (2d Cir. 1990).  IGRA divides gaming into three classes; Class III gaming refers to traditional casino games such as blackjack and roulette, and expressly includes "sports betting." 25 C.F.R. § 502.4; *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014); *W. Flagler Assocs. v. Haaland*, 71 F.4th 1059, 1062 (D.C. Cir. 2023); 25 U.S.C. § 2703.  Revenue from these gaming activities may be used only for statutorily defined governmental purposes, including "to fund tribal government operations or programs" and "to provide for the general welfare of the Indian tribe and its members."  25 U.S.C. § 2710(d)(1)(A)(ii).

Under IGRA's framework, "Class III gaming activities," including sports betting, are "lawful on Indian lands only if" they are "authorized by" a tribal "ordinance or resolution" and "conducted in conformance with a Tribal-State compact."  25 U.S.C. § 2710(d)(1).  For such compacts, IGRA establishes a cooperative negotiation process that gives tribes and state governments a role in determining the scope of authorized gaming on tribal lands. *See id*.  If a tribe and state cannot agree on a compact, IGRA permits the lawful operation of gaming on tribal lands through "secretar[ial] … procedures"—i.e., gaming procedures prescribed by the Secretary of the Interior. *Id.* § 2710(d)(7)(B)(vii).

Both Tribes offer Class III gaming on their Indian lands, including online and in-person sports betting.  The Pequot Tribe offers Class III gaming under procedures that were first

4

prescribed by the Secretary of the Interior in 1991.[1]  The Mohegan Tribe offers Class III gaming

under a tribal-state compact with the State of Connecticut that was initially executed in 1994.[2]

Under IGRA and the relevant compact and procedures, the Tribes "posses[s] all sovereign

powers" associated with their status as federally recognized Indian tribes, and they are the primary

regulator of all gaming that occurs on their Indian lands via their respective gaming agencies, the

Mashantucket Pequot Tribal Gaming Commission ("MPTGC") and Mohegan Tribal Gaming

Commission ("MTGC").  *See* Mashantucket Pequot Gaming Procedures ¶ 2(z) (designating

MPTGC as "the single tribal agency responsible for regulatory oversight of Class III Gaming as

authorized by this Compact");[3] Tribal-State Compact Between the Mohegan Tribe and the State

of Connecticut ¶ 2(z) (same for MTGC).[4]

In 2021, the Tribes reached agreements with the State to further amend their respective

compact and procedures to provide the Tribes with exclusivity for online casino gaming in the State;

two of three available licenses for statewide online sports wagering (on non-Indian lands); terms for

offering online gaming on Indian lands; and the right to offer online and in-person casino gaming

and sports wagering.  2021 Conn. H.B. No. 6451 (May 27, 2021); Conn. Gen. Stat. §§ 12-851, 12-

852.  To implement those agreements, the Connecticut General Assembly amended state law to

issue "a master wagering license" to the Tribes (or their affiliates) to operate online sports

---

[1] Indian Gaming; Opportunity to Comment on Mashantucket Pequot Gaming Procedures, 56 Fed. Reg. 15,746 (Apr. 17, 1991); Notice of Final Mashantucket Pequot Gaming Procedures, 56 Fed. Reg. 24,996 (May 31, 1991); *see also* Indian Gaming; Amendment to Class III Gaming Procedures for the Mashantucket Pequot Tribe, 84 Fed. Reg. 11,122 (Mar. 25, 2019) (amended procedures).

[2] Indian Gaming, 59 Fed. Reg. 65,130 (Dec. 16, 1994); Indian Gaming; Tribal-State Class III Gaming Compact Taking Effect in the State of Connecticut, 83 Fed. Reg. 25,484 (June 1, 2018) (amended compact).

[3] https://perma.cc/PBX8-G2XY.

[4] https://perma.cc/5BTH-BQZQ.

wagering in Connecticut.  Conn. Gen. Stat. § 12-852.  The Pequot Tribe executed an agreement with Connecticut to amend its secretarial procedures and associated memorandum of understanding to permit sports wagering, which the Department of the Interior approved.[5]  The Mohegan Tribe and Connecticut likewise amended their compact and memorandum of understanding.[6]

Since then, both Tribes have entered into agreements with third parties to offer legalized sports betting across Connecticut and on their Indian lands.[7]  And sports betting has already had a profound impact on the Tribes' economic interests.  Since 2021, Connecticut bettors have placed more than $7.4 billion in sports wagers, leading to roughly $773 million in revenue for operators.[8]  In 2025 alone, revenue from sports betting was $265.9 million.[9]  Unlike the private financial benefit earned by prediction markets for their sports betting offerings, this revenue generated by tribal gaming has supported the Tribes' ability to provide critical governmental services that address a range of Tribal citizen needs, including education, public safety, housing, and healthcare.

### B.    Prediction Markets Offer Sports Betting in Violation of Connecticut Law and IGRA

Connecticut law generally prohibits gambling, *see* Conn. Gen. Stat. § 53-278b, subject to exceptions for licensed activities, *id.* § 53-278g.  To operate online gaming in Connecticut,

---

[5] *See* Letter from Bryan Newland, Assistant Secretary, Indian Affairs, to Rodney Butler, Chairman, Mashantucket Pequot Tribal Nation (Sept. 10, 2021) ("2021 Approval Letter"), https://perma.cc/BW2Z-G4RW.

[6] Indian Gaming; Approval of Tribal-State Class III Gaming Compact in the State of Connecticut, 86 Fed. Reg. 51,369 (Sept. 15, 2021).

[7] *FanDuel Announces Market Access Partnership with Mohegan Gaming & Entertainment to Operate Sports Betting, iGaming and DFS in Connecticut* (July 7, 2021), https://perma.cc/59D9-CTKZ; *Foxwoods and DraftKings Launch Online Sports Betting and iGaming in Connecticut* (Oct. 19, 2021), https://perma.cc/SBV7-KBAV.

[8] Ingi Thor Arngrimsson, *Connecticut's Sports Betting Success Comes with a Catch*, iGamingToday (Jan. 23, 2026), https://perma.cc/97XC-33KP.

[9] American Gaming Ass'n, *State of the States 2026*, at 39 (May 2026), https://perma.cc/644S-AQJT.

operators must obtain a license from the Connecticut Department of Consumer Protection. *Id.* § 12-857. Without such a license, operators would not only violate state law, but would also violate IGRA if they offer gaming to customers on Indian lands because IGRA directs that Class III gaming is "lawful on Indian lands only if" it is "authorized by" a tribal "ordinance or resolution" *and* "conducted in conformance with a Tribal- State compact entered into by the Indian tribe and the State … that is in effect." 25 U.S.C. § 2710(d). Operators who offer unlicensed gaming on tribal lands infringe upon the Tribes' recognized interest in "economic development, self-sufficiency, and strong … governmen[t]." 25 U.S.C. § 2702(1).[10]

Beginning in late 2024, several companies registered with the CFTC as Designated Contract Market ("DCM") operators, including KalshiEX, LLC ("Kalshi") and the North American Derivatives Exchange, Inc., d/b/a Crypto.com | Derivatives North America ("Crypto.com"), began offering sports bets nationwide, including in Connecticut. *See* Dkt. 1, ¶ 60 (Compl.); Dkt. 22. Referring to themselves as "prediction markets," these companies permit users to wager real money on whether a particular team will win or lose a sporting event, as well as on numerous other aspects of games, including point spreads, overs and unders for total points, proposition bets on individual player performances within a single game, and parlays that combine bets on multiple sporting event outcomes into a single wager that pays only if *all* of the individual bets are correct.[11] The CFTC initially requested that the prediction markets "suspend any listing and trading" of their "sports contracts" while it reviewed for compliance with the Commodity

---

[10] Off-reservation, there are three operators offering statewide online sports betting pursuant to state law and federally approved agreements (the Tribes and the Connecticut Lottery Corporation); on-reservation, each Tribe is the sole gaming operator and offers sports betting pursuant to compacts and procedures established under federal law, as well as tribal law.

[11] *See* Kalshi, *Combos* (Mar. 25, 2026), https://perma.cc/WH6Z-G73N; Dustin Gouker, *Most of Kalshi's Recent Volume Growth Comes From Parlays*, Event Horizon (May 6, 2026), https://perma.cc/5VKV-KRCG.

Exchange Act ("CEA").[12]  According to the prediction markets, however, their sports bets qualify as "swaps" under the CEA and are thus subject to the CFTC's exclusive jurisdiction and a federal statutory regime that preempts state gaming laws.  *See, e.g.*, Dkt. 24-1 at 3–4.  The graphic below—published in a *New York Times* article regarding Kalshi's expansion into sports betting—illustrates the prediction markets' sports bets and their resemblance to traditional wagers.[13]  The first image shows betting options for an NFL game on a state-regulated online sportsbook; the second shows betting options offered by Kalshi for the same game.  Both use the same format, offer bets on the same point spread, and offer bets on the same over/under for the number of points scored.





The prediction markets' sports betting operations are also indistinguishable from those offered by the Tribes.  Below is a side-by-side comparison of the same wagers from the same date

---

[12] Commodity Futures Trading Commission, *CFTC's Review of Nadex Sports Contract Submissions*, Release No. 9033-25 (Jan. 14, 2025), https://www.cftc.gov/PressRoom/PressReleases/9033-25.

[13] Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025), https://perma.cc/JZ9K-7HX8.

on the Mohegan Tribe's mobile sports wagering app (left) and Kalshi's mobile sports wagering app (right):[14]

 

On December 2, 2025, the State issued cease-and-desist letters to prediction market operators (including Kalshi and Crypto.com), alleging that they are engaged in "unlicensed online gambling, more specifically sports wagering," in violation of Conn. Gen. Stat. §§ 53-278b, 53-

---

[14] *Comments of the Mohegan Tribe on Commodity Futures Trading Commission Advance Notice of Proposed Rulemaking, Prediction Markets*, RIN 3038-AF65, at 20 (Apr. 29, 2026), https://perma.cc/SN92-ZLDK.

278d, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, et seq.  Compl. ¶ 60; *e.g.*, Dkt. 24-4.  The letters explain that the prediction markets' sports event contracts "constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events."  Dkt. 24-4 at 1. The prediction markets "d[o] not possess an online gaming operator's license … or any other relevant qualification that would allow [the prediction market] to provide online gaming to Connecticut residents."  *Id.* at 2.  And even if the prediction markets had a license, their sports bets "still violate numerous other Connecticut laws and public policies" including by "allow[ing] for individuals under 21 years of age to place wagers and allow[ing] illegal wagers on Connecticut intercollegiate teams."  *Id.* (citing Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30)).

### C.    Procedural History

On April 2, 2026, the Federal Government initiated this action against the State "in response to Defendants' sending of cease-and-desist letters to various CFTC-regulated entities." Compl. ¶ 1.  The Federal Government asserted that the State's efforts to restrict unauthorized sports betting "directly interfere with Plaintiffs' authority" to regulate prediction markets' activities.  *Id.* ¶ 8.  The Federal Government brought three claims under the Supremacy Clause, arguing that Connecticut law is preempted as applied to transactions on DCMs.  *Id.* ¶¶ 77–94.[15]

On May 1, the State requested a pre-filing conference, noting that it intends to move to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing.  Dkt. 22.

---

[15] The Federal Government has filed nearly identical suits in Arizona, Illinois, New York, and Wisconsin.  *See United States v. Arizona*, No. 2:26-cv-2246 (D. Ariz.); *United States v. Illinois*, No. 1:26-cv-3659 (N.D. Ill.); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y.); *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis.).

One week later, Crypto.com moved to intervene as a Plaintiff.  Dkt. 24.  On May 14, the Federal Government responded to the State's letter and explained that it intends to file a motion for summary judgment.  Dkt. 40.  The Federal Government further proposed that all discovery deadlines be stayed.  *Id.*  The Court has scheduled a pre-filing conference regarding these motions for May 27.  Dkt. 41.

## ARGUMENT

### I.    The Tribes Are Entitled to Intervene as of Right Under Rule 24(a).

To intervene as of right under Federal Rule of Civil Procedure 24(a), a movant must "(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action."  *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 799 (2d Cir. 2022).  The Tribes satisfy all four elements and therefore "must" be permitted leave to intervene.  Fed. R. Civ. P. 24(a).

### A.    The Tribes' Motion is Timely.

The Tribes' motion to intervene is timely because it was filed less than two months after this action began and before the State's response to the Complaint, such that no party would be prejudiced by the timing of the Tribes' motion.  Courts consider four factors in determining timeliness of a motion to intervene: "(a) the length of time the applicant knew or should have known of its interest before making the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to the applicant if the motion is denied; and (d) the presence of unusual circumstances militating for or against a finding of timeliness."  *MasterCard Int'l, Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 390 (2d Cir. 2006) (citation omitted).

All of these factors counsel in favor of finding that the Tribes' motion is timely. *First*, this action was filed less than two months ago, meaning that the Tribes necessarily learned of it only recently.

*Second*, granting the motion would not prejudice the other parties. The State has not yet responded to the Complaint, and recently proposed to file a motion to dismiss by May 29, 2026. Dkt. 22. In response, the Federal Government announced that it intends to respond to the State's motion and file a motion for summary judgment. Dkt. 40. If the Court grants the Tribes' motion to intervene, the Tribes will not participate in briefing on the State's Rule 12 motion. However, given the significant and immediate threats the Federal Government's claims pose to their sovereign and economic interests, the Tribes would participate in summary judgment briefing and other core aspects of the case (including any appeals).

*Third*, for the same reasons discussed below, the Tribes would suffer significant prejudice if they were denied leave to intervene. *See infra* at 13–15.

*Fourth*, there are no unusual circumstances that would weigh against a finding that the Tribes' motion is timely.

Courts in this District have granted motions for leave to intervene that were brought in similar periods of time. *See, e.g.*, *United States v. Palermino*, 238 F.R.D. 118, 121 (D. Conn. 2006) (motion filed one month after commencement of action); *Schaghticoke Tribal Nation v. Norton*, 2006 WL 1752384, at *8 (D. Conn. June 14, 2006) (motion filed three months after suit was filed, "at a very early stage in th[e] litigation"); *Allco Fin. Ltd. v. Etsy*, 300 F.R.D. 83, 86 (D. Conn. 2014) (motion filed three months after commencement of action). This Court should similarly find that the Tribes' motion is timely.

**B.      The Tribes Have a Substantial Interest in the Outcome of This Litigation.**

The Tribes also satisfy Rule 24(a)'s requirement that they have a significant interest in the outcome of this litigation.  A cognizable interest under Rule 24(a) "must be direct, substantial, and legally protectable." *In re N.Y.C. Policing*, 27 F.4th at 799 (citation omitted).

This case is no ordinary dispute between private parties.  The claims asserted by the Federal Government concern the regulatory structure for a large and growing market, and resolution of those claims will affect a broad range of stakeholders, including the Tribes.  Specifically, the Tribes have a "direct, substantial, and legally protectable" interest in the disposition of the Federal Government's claims for two core reasons.

*First*, the suit implicates the Tribes' sovereign regulatory interests.  A ruling that the CFTC has exclusive jurisdiction to regulate sports bets offered by prediction markets would interfere with the Tribes' federally approved government-to-government agreements with the State of Connecticut, which, pursuant to IGRA, recognize the Tribes—not the CFTC—as possessing the exclusive right to regulate gaming on Indian lands.  *See supra* at 3–6.  These sovereign interests are legally protectable because IGRA mandates that Class III gaming may be offered on Indian lands only if it is authorized by a tribal-state compact or secretarial procedures.  *See* 25 U.S.C. § 2710(d)(1), (7); *Maverick Gaming LLC v. United States*, 123 F.4th 960, 972 (9th Cir. 2024) ("[B]ecause of the importance of tribal gaming compacts and the revenue that these compacts provide … as well as the long history of tribal gaming and its associated benefits for the tribes," challenges to a tribe's gaming compacts "implicat[e] the [t]ribe's legally protected economic and sovereign interests"); *Montgomery v. Seminole Hard Rock Digital, LLC*, 2025 WL 448936, at *2 (M.D. Fla. Feb. 10, 2025) (tribe has interest "in defending its ongoing right to conduct gaming on its lands").

13

*Second*, the Federal Government's claims implicate the Tribes' unique interests in generating governmental revenue through the statewide online sports betting market. Those interests are governed in part by the state laws the Federal Government seeks to preempt. They are also rooted in and protected by the Tribes' compacts and procedures, which provide the Tribes with "meaningful concessions" in return for the Tribes making revenue sharing payments to the State.[16] A ruling in the Federal Government's favor would free prediction markets to offer sports bets in Connecticut without obtaining state licenses or paying state gaming taxes and federal excise taxes on state-authorized gaming. That scheme would eviscerate the Tribes' federally approved exclusivity rights under the gaming compacts and state law, significantly harm the Tribes' ability to generate revenues in order to provide critical governmental services, and fundamentally alter an agreed upon government-to-government regulatory framework for statewide sports betting.[17]

Courts have repeatedly held that such economic effects satisfy Rule 24(a)'s requirements. *See, e.g.*, *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 331 F.R.D. 5, 10 (D.D.C. 2019) (intervenor tribes had interest in potential "loss of gaming dollars" and "consequent reduction in funding for governmental services that tribes provide to their members"); *see also N. Am. Derivatives Exchange, Inc. v. Nevada*, 2025 WL 4670470, at *1 (D. Nev. Sept. 9, 2025) (*Crypto.com*) (association representing licensed casino operators had sufficient interest to intervene because its members "would be placed at a considerable competitive disadvantage" if prediction markets could offer unlicensed sports betting). Indeed, courts have applied this reasoning to cases, like this one, that involve regulation of the Connecticut gaming market. *See,*

---

[16] 2021 Approval Letter, *supra* note 5, at 3.

[17] *See* American Gaming Ass'n, *Gaming Regulations and Statutory Requirements: Connecticut*, at 6 (2026), https://perma.cc/Y5JS-4TC4 (noting that "the Tribes are required to pay a 13.75% tax on off-reservation sports betting").

*e.g.*, *MGM Global Resorts Dev., LLC v. U.S. Dep't of the Interior*, 2020 WL 5545496, at \*4 (D.D.C. Sept. 16, 2020) (Mohegan and Pequot Tribes had an "obvious" and "legally protected interes[t]" in third party's suit challenging approvals that "authorize[d]" the Tribes to operate a new casino).

### C.    The Disposition of This Action Could Impair the Tribes' Interests.

The disposition of this action could, as a practical matter, impair the Tribes' interests. "The inquiry into impairment of interest looks to 'the practical disadvantage suffered.'" *Allco*, 300 F.R.D. at 87 (citation omitted).

The Tribes would suffer several practical disadvantages from a ruling in favor of the Federal Government, as explained in the preceding section. *See also MGM Global Resorts*, 2020 WL 5545496, at \*4 (lawsuit challenging approval of amendments to tribal-state compact and procedures "could impair or impede [the tribes'] ability to protect th[eir] interest" in the amendments and proposed casino project); *Sault Ste. Marie Tribe*, 331 F.R.D. at 13 (lawsuit "threatens to impair" the tribes' interest in "continued opposition to the planned casinos"); *Maverick Gaming LLC v. United States*, 658 F. Supp. 3d 966, 971 (W.D. Wash. 2023), *aff'd*, 123 F.4th 960 (9th Cir. 2024) (litigation could "impair" tribes' interest given "importance of their gaming compacts," "revenue that such compacts provide," "long history of tribal gaming," and "associated employment benefits for the tribes and the surrounding community"). To be clear, these practical disadvantages are not limited to the context of on-reservation gaming governed by IGRA; they extend to the Tribes' off-reservation gaming rights, which apply throughout Connecticut and are subject to the same state laws the Federal Government seeks to preempt in this lawsuit.

15

**D.     The Existing Parties Do Not Adequately Represent the Tribes' Interests.**

The Tribes also satisfy "the minimal burden required for a showing that representation by the existing parties may be inadequate." *In re N.Y.C. Policing*, 27 F.4th at 803 (citation omitted). Intervention is warranted when the movants "sho[w] that representation of [their] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Id.* (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)); *see also Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179, 195–96 (2022) (Rule 24 "present[s] proposed intervenors with only a minimal challenge").

Here, the State cannot adequately represent the Tribes because their interests differ in material respects. For instance, the State is likely to focus on its own sovereign authority and the Federal Government's lack of interest in a dispute between the State and the prediction markets. *See* Dkt. 22 (arguing that the Federal Government lacks Article III standing). The Tribes recognize the State's prerogatives on those issues, but as noted above would not participate in briefing on the State's planned motion to dismiss. Meanwhile, the Tribes intend to advance their own distinct arguments, including that the Federal Government's claims conflict with IGRA and tribal sovereignty, and that the Federal Government's claims interfere with the Tribes' interests as master wagering licensees under state law. Because the Tribes "are concerned with preserving their own rights and opportunities, including their specific economic development goals, both under the IGRA and in their capacities as sovereign entities," the State cannot sufficiently represent their interests. *Forest Cnty. Potawatomi Cmty. v. United States*, 317 F.R.D. 6, 15 (D.D.C. 2016); *see also Maverick Gaming*, 123 F.4th at 974–75 (although government "maintains an interest in defending … its decision to approve the sports-betting compact amendments, it does not share an interest in the *outcome* of the continued approval of the sports-betting compact amendments—the

16

continued operation of sports-betting at tribal casinos"—which the tribe asserts is a matter of sovereign authority); *Gameroom Superstores, LLC v. Brodsky*, 2013 WL 3701909, at *2 (M.D. Fla. July 12, 2013) ("Although the Seminole Tribe and the Florida State Attorney share an interest … the Seminole Tribe has the *additional* unrepresented interest of protecting its exclusive rights to casino-style gaming."); *Glacier Cnty. Reg'l Port Authority v. Esau*, 2022 WL 16948623, at *4 (D. Mont. Nov. 15, 2022) (state agency has interest in "enforc[ing] state law" and is "incapable of making all the arguments that would be set forth by the [tribe] given the fundamental tribal sovereignty interests at stake").

Going forward, even if the State's and the Tribes' arguments overlap in some respects, their interests will not be identical because they will seek to protect different sovereign rights.  The State's interests "include enforcing the [Connecticut] gaming laws," while the Tribes will be positioned to discuss their "concer[n] about the competitive disadvantages they face" if the prediction markets are able to offer unlicensed gaming, *Crypto.com*, 2025 WL 4670470, at *1, as well as their federally protected authority to regulate gaming on their Indian lands, raise revenue for their tribal governments, and negotiate the contours of gaming regulation within and outside of Indian lands with the State.  As one court recently explained, even if the prediction markets' "sports-event contracts are swaps subject to the CFTC's jurisdiction" that does not mean "that the CEA would necessarily preempt or repeal IGRA, nor limit [tribes'] tribal authority."  *Ho-Chunk Nation v. Kalshi, Inc.*, 2026 WL 1284077, at *10 (W.D. Wis. May 11, 2026); *see also Forest Cnty.*, 317 F.R.D. at 15 (permitting tribes to intervene to "preserv[e] their own rights and opportunities, including their specific economic development goals, both under the IGRA and in their capacities as sovereign entities"); *Berger*, 597 U.S. at 197 (even when "state agents may pursue 'related' state interests," they "cannot be fairly presumed to bear 'identical' ones" (citation omitted));

17

*Palermino*, 238 F.R.D. at 122–23 (state defendants did not adequately represent interests of the "individuals and consumers" that were championed by movants); *Schaghticoke Tribal Nation*, 2006 WL 1752384, at *6 ("[I]nadequate representation by [government] is more likely to be found if the [m]ovants 'assert a personal interest that does not belong to the general public." (citation omitted)).  Because there is only a partial "congruence of interests here," the Tribes' rights are not adequately represented.  *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 133 (2d Cir. 2001).

## II.    Alternatively, the Tribes Should Be Permitted to Intervene Under Rule 24(b).

Federal Rule of Civil Procedure 24(b) allows a court to permit intervention where the motion is timely, the movant has a claim or defense that shares with the main action a common question of law or fact, and intervention will not unduly interfere with resolution of the suit.  The "principal consideration" is "whether intervention will unduly delay or prejudice the adjudication of the rights of the original parties."  *Ass'n of Conn. Lobbyists LLC v. Garfield*, 241 F.R.D. 100, 102 (D. Conn. 2007).  Courts also consider other factors—many of which overlap with the Rule 24(a) elements—including (1) "whether the applicant will benefit by intervention," (2) "the nature and extent of the intervenors' interests," (3) "whether [the intervenors'] interests are adequately represented by the other parties," and (4) "whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented."  *Schaghticoke Tribal Nation*, 2006 WL 1752384, at *8 (citing *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191–92 (2d Cir. 1978)).

These considerations weigh in favor of allowing the Tribes to intervene.  *First*, the Tribes' proposed intervention will not create undue delay or prejudice the adjudication of the rights of the original parties.  As described above, the Tribes' motion is timely as this litigation remains at its early stages.  *See supra* at 11–12.

18

*Second*, for the reasons stated above, the Tribes satisfy the remaining factors. The Tribes have defenses that share "a common question of law or fact" with those of the parties because the Tribes have a significant interest in ensuring that the State is able to enforce its gaming laws—including by being able to bring enforcement actions against unlicensed entities that offer gaming in violation of Connecticut law and the federally approved gaming agreements. *See Crypto.com*, 2025 WL 4670470, at *2 (granting permissive intervention); *Sault Ste. Marie Tribe*, 331 F.R.D. at 14 (same); *Schaghticoke Tribal Nation*, 2006 WL 1752384, at *8–9 (same). As the Supreme Court has explained, Indian tribes' "participation in litigation critical to their welfare should not be discouraged." *Arizona v. California*, 460 U.S. 605, 615 (1983).

## CONCLUSION

For the reasons given above, the Tribes respectfully request that the Court grant their motion to intervene as of right, or in the alternative, grant permissive intervention.

Respectfully submitted,

/s/ David A. Luttinger, Jr.

| | |
|---|---|
| Bryan Newland (*pro hac vice* forthcoming)<br>POWERS PYLES SUTTER & VERVILLE PC<br>1250 Connecticut Ave NW, Eighth Floor<br>Washington, DC 20036<br>(202) 466-6550<br>Bryan.Newland@powerslaw.com | David A. Luttinger, Jr. (Bar No. ct28859)<br>COVINGTON & BURLING LLP<br>30 Hudson Yards<br>New York, NY 10001<br>(212) 841-1000<br>dluttinger@cov.com |
| *Counsel for The Mohegan Tribe of Indians of Connecticut* | Kevin F. King (application forthcoming)<br>Thomas Brugato (application forthcoming)<br>COVINGTON & BURLING LLP |
| Joseph H. Webster (*pro hac vice* forthcoming)<br>HOBBS STRAUS DEAN & WALKER LLP<br>1899 L Street NW, Suite 1200<br>Washington, DC 20036<br>JWebster@hobbsstraus.com | 850 10th Street NW<br>Washington, DC 20001<br>(202) 662-6000<br>kking@cov.com<br>tbrugato@cov.com |
| *Counsel for The Mashantucket Pequot Tribal Nation* | *Counsel for The Mohegan Tribe of Indians of Connecticut and The Mashantucket Pequot Tribal Nation* |

May 26, 2026

19

## CERTIFICATE OF SERVICE

I hereby certify that, on May 26, 2026, I caused the foregoing document to be filed with the Clerk of the Court of the United States District Court for the District of Connecticut using the Court's CM/ECF system.

/s/ David A. Luttinger, Jr.
David A. Luttinger, Jr.

*Counsel for The Mohegan Tribe of Indians of Connecticut and The Mashantucket Pequot Tribal Nation*

20