**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| THE UNITED STATES OF AMERICA; and COMMODITY FUTURES TRADING COMMISSION, <br><br> *Plaintiffs,* <br><br> v. <br><br> STATE OF CONNECTICUT; NED LAMONT, the Governor of Connecticut in his official capacity; WILLIAM TONG, in his official capacity as Attorney General of Connecticut; BRYAN CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION, GAMING DIVISION; KRISTOFER GILMAN, in his official capacity as Director of the Gaming Division of the Connecticut Department of Consumer Protection, <br><br> *Defendants.* | Case No.: 3:26-cv-00498 (VDO) <br><br><br><br> **MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1)** |

**INTRODUCTION**

Connecticut's protection of its consumers from illegal gambling does nothing to the federal jurisdiction over swaps trading and is indeed consistent with federal regulations. Inexplicably, the United States and Commodity Futures Trading Commission (CFTC) (together, "CFTC") chooses to deploy its considerable resources not on the side of good governance and consumer protection but multi-billion-dollar speculation predators.[1] Though the case is utterly wrongheaded on the merits, the Court

---

[1] *See* Sharon LaFraniere, How Prediction Markets and Crypto Firms Steamrolled a Watchdog Agency, NY Times (May 24, 2026) *available at* https://www.nytimes.com/2026/05/24/us/how-prediction-markets-and-crypto-firms-steamrolled-a-watchdog-agency.html.

must dismiss it under Rule 12(b)(1) before addressing the merits because CFTC lacks standing to bring this action in the first place. Article III of the Constitution does not permit the federal government to sue States based on abstract theories of federal preemption without any injury in fact to the government. Further, CFTC fails to allege the requisite enforcement responsibility of most Defendants for the challenged gambling-related statutes. The Complaint should be promptly dismissed.

## BACKGROUND

### I.     The Parties

Plaintiff CFTC is the federal regulator of commodity futures markets. *See* Complaint, ECF 1 ("Compl.") ¶¶ 14, 28. The United States of America is nominally a plaintiff, but the Complaint does not allege interests or theories on behalf of the United States that are different or greater than those of the CFTC in its capacity as the federal commodity futures trading regulator; therefore, Defendants refer to Plaintiffs collectively as CFTC.

Defendants are the State of Connecticut; Governor Led Lamont; Attorney General William Tong; Commissioner of the Department of Consumer Protection (DCP) Bryan Cafferelli; "Connecticut Department of Consumer Protection, Gaming Division"; and Kristofer Gilman, Director of the Gaming Division of DCP. CFTC claims or implies that all Defendants are responsible for enforcing Connecticut's gambling laws, *see* Compl. § III, which is incorrect as a matter of law, as discussed *infra*.

### II.     Swaps and Sports Event Contracts

While a detailed overview of commodity futures regulation is not necessary for the resolution of this Motion, the following facts are pertinent. Plaintiff CFTC is charged

2

with regulating the nation's commodities futures trading markets under the Commodity Exchange Act (CEA), 7 U.S.C. § 1 *et seq*. Among the types of contracts CFTC regulates are derivatives, which are contracts based on underlying prices, indices, or events, and which, "[i]n general, market participants use…to hedge risks or speculate on commodity price movements." Compl. ¶ 29. The 2010 Dodd-Frank financial reform legislation amended the CEA to give CFTC jurisdiction over a purely financial type of derivatives known as swaps. 124 Stat. 1376, 1672 § 722. In general, swaps are "pure financial instruments based on the difference between two fluctuating values." *See United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (cleaned up). For instance, parties might agree to swap future interest payments at different rates, or future payments in one currency for payments in another. Dodd-Frank added swaps to CFTC's jurisdiction in the wake of the 2008 financial crisis, which is widely considered to have resulted from unregulated commercial trading in credit default swaps meant to hedge mortgage-backed securities. *See id.* at 113 (citing report "concluding that unregulated swaps 'contributed significantly' to the 2008 financial crisis, including being at the 'center of the storm' when the housing bubble burst").

Section 2 of the CEA provides CFTC with "exclusive jurisdiction" over swaps, but preserves, "[e]xcept as hereinabove provided," "the jurisdiction at any time conferred on…other regulatory authorities under the laws of the United States or of any State," and "the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2(a)(1)(A). Based on this language, CFTC challenges Connecticut law's application to

3

certain "event contracts," some of which may meet the definition of swaps, and are traded on CFTC-regulated exchanges. Compl. ¶¶ 1-2.

As relevant here, since approximately 2025, certain financial technology companies have offered sports wagers to the general public, characterized as swaps, that depend on the outcomes of, or happenings during, sporting and other entertainment events ("sports event contracts"). These include results, *e.g.*, which team or player will win a sporting event or series; propositions, *e.g.*, the number of runs scored in a baseball game, whether a player will record a certain statistic, or how a match will be won; and combinations thereof. *See*, *e.g.*, *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 U.S. App. LEXIS 12260, at *6 (6th Cir. Apr. 24, 2026) (describing Kalshi's sports wagering offerings before denying its motion for injunction pending appeal).

In Connecticut, it is illegal to offer sports wagers without a license from DCP. *E.g.* Conn. Gen. Stat. § 53-278b (criminal gambling prohibition); *id.* § 52-553 (voiding unlawful gambling wagers); *id.* § 12-850(34) (defining lawful "sports wagering" under statutory sports betting scheme). On December 2, 2025, DCP issued identical cease and desist letters to three companies offering sports event contracts: KalshiEX, Robinhood, and Crypto.com. Exhibit A (cease and desist letters). The letters advised the companies that their offer of sports event contracts in Connecticut violated state laws including the statutes above, and demanded that they cease offering such contracts to Connecticut residents, advising that "[f]ailure to comply may result in additional action including, but not limited to, civil penalties under [the Connecticut Unfair Trade Practices

Act, Conn. Gen. Stat. § 42-110b *et seq.*] and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d." *Id.*

### III.    CFTC's Allegations

After a period of well-justified skepticism toward sports event contracts' being traded on the nation's commodity markets, including issuing regulatory guidance stating that "gambling is overseen by state regulators," and that "[t]he Commission is not a gaming regulator," 89 Fed. Reg. 48968, 48982-83 (June 10, 2024) and urging "appropriate contingency planning, disclosures, and risk management policies and procedures" to account for State regulatory action as to sports event contracts, CFTC Letter No. 25-36 (Sept. 30, 2025) (Exhibit B), the CFTC has now made an about-face. Under the authority of its new Chair, who is also its sole commissioner, it filed this Complaint, characterizing DCP's cease and desist letters as no less than an "attempt to shut down federally regulated DCMs and an FCM,"[2] Compl. ¶ 3, claiming the State "intrudes on the exclusive federal scheme Congress designed to oversee national swaps markets," *id.*, and asserting that "Defendants directly interfere with Plaintiffs' authority pursuant to the federal scheme imposed by Congress through the CEA," *id.* ¶ 8. As explained below, CFTC does not allege *how* any actual or contemplated enforcement action by the State of Connecticut interferes with its authority—nor could it, as CFTC's own regulations *prohibit* the offering of any swap "that involves, relates to, or references…gaming…or an activity that is unlawful under any State or Federal law," 17 C.F.R. § 40.11(a)(1).

---

[2] Kalshi and Coinbase have, at all relevant times, been DCMs, or Designated Contract Markets. Compl. ¶ 23. Robinhood offers events contracts as an FCM, or Futures Commission Merchant. *Id.*

## LEGAL STANDARD

"A motion to dismiss for lack of Article III standing challenges the subject-matter jurisdiction of a federal court and, accordingly, is properly brought under Fed. R. Civ. P. 12(b)(1)." *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020). The Court must address its subject matter jurisdiction to hear the Government's claim before this action proceeds any further. "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). "Federal district courts must assess concerns about their subject matter jurisdiction at any stage in the proceedings." *Karagozian v. Luxottica Retail N. Am.*, No. 3:13-cv-1028, 2016 U.S. Dist. LEXIS 66521, at *1 (D. Conn. May 20, 2016) (citing cases).

To establish Article III standing, a plaintiff must prove: "(1) injury-in-fact, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) causation in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements….Where, as here, a case is at the pleading stage, the plaintiff must clearly…allege facts demonstrating each element." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016).

The federal government is not immune from establishing Article III standing. *E.g. United States v. San Jacinto Tin Co.*, 125 U.S. 273, 284 (1888); *United States v.*

6

*Mattson*, 600 F.2d 1295, 1297 (9th Cir. 1979); *United States v. California*, No. 2:25-cv-06230-MCS-AGR, 2026 U.S. Dist. LEXIS 61221, at *4-5 (C.D. Cal. Mar. 18, 2026).

## ARGUMENT

### I.    CFTC's complaint fails to allege an injury in fact.

The Complaint must be dismissed for lack of subject matter jurisdiction because CFTC fails to allege any injury in fact based on enforcement of State gambling law as to swaps offered by a DCM.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.* 578 U.S. at 339. The plaintiff must show that the challenged conduct affects the plaintiff "in a personal and individual way." *Id.* Plaintiff must also show that the injury is concrete, in other words, that it is "de facto" or actually exists. *Id.* at 339-40.

First, CFTC does not allege that any proposed regulatory action by the State targets CFTC or its operations—nor could it. CFTC does not allege, for example, that Connecticut seeks to prohibit *it* from offering sports event contracts or engaging in any other conduct. Rather, this action appears designed to vindicate the interests of private, regulated entities (CFTC specifically names Kalshi, Crypo.com, and Robinhood, Compl. ¶¶ 22-24) and protect them from the possibility of a Connecticut enforcement action. *See* Compl. ¶ 1 ("Plaintiffs bring this action in response to Defendants' sending of cease and desist letters to various *CFTC-regulated entities*…") (emphasis added); *see also* Compl., Relief Requested ¶ 1 (requesting that the Court enter a declaratory judgment that "the challenged provisions…*as applied to CFTC-Designated Contract Markets*,

violated the Supremacy Clause and are therefore preempted") (emphasis added). But an injury to third parties such as CFTC-regulated markets is generally insufficient to confer standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) ("When…a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed"). "[I]f it is apparent that the suit is brought for the benefit of some third party, and that the United States has no pecuniary interest in the remedy sought, and is under no obligation to the party who will be benefited to sustain an action for his use…it can no more sustain such an action than any private person could under similar circumstances." *San Jacinto Tin Co.*, 125 U.S. at 286; *see also Cinicola v. Lamont*, No. 3:25-CV-493 (VDO), 2026 U.S. Dist. LEXIS 592, at *7-8 (D. Conn. Jan. 5, 2026) ("To be particularized, the injury must affect the plaintiff in a personal and individual way, and…a party cannot see redress for injuries done to others") (cleaned up). Because CFTC does not allege that it is in any way a target of any actual or contemplated State enforcement action, it cannot meet its burden to demonstrate standing.

Second, CFTC has not identified any impact—let alone a concrete or particularized one—of Connecticut's hypothetical enforcement of the challenged statutes on any sovereign interest. The Complaint alleges that the cease and desist letters threaten civil and criminal penalties for violating State law, *e.g.* Compl. ¶ 64, but does not assert how CFTC, or even the lawful commodity trading system it is charged to regulate, are harmed or even affected thereby. For instance, while CFTC includes a bare assertion that "Defendants directly interfere with Plaintiffs' authority," *id.* ¶ 8, it does not contend that the challenged State statutes actually impede its operations under the

CEA in any way. *Compare United States v. City of Arcata*, 629 F.3d 986, 989 (9th Cir. 2010) (U.S. had Article III standing where challenged ordinances expressly restricted Armed Forces recruitment); *with United States v. California*, No. 2:25-cv-6230, 2026 U.S. Dist. LEXIS 61221, at *8-9 (C.D. Cal. Mar. 18, 2026) (no standing where government "neither pleads nor presents" a theory that enforcement of state law "imped[es] the operations or functions of the federal government"); *United States v. Hawaii*, No. 25-cv-179, 2026 U.S. Dist. LEXIS 82461, at *12-14 (D. Haw. Apr. 15, 2026) (no standing where government failed to demonstrate harm to federal interests from state's intended actions against fossil fuel companies).

While the Arizona District Court concluded in a one-paragraph analysis that CFTC had standing in a parallel case, *KalshiEX LLC v. Johnson*, No. cv-26-1715, 2026 U.S. Dist. LEXIS 98759, at *8-9 (May 5, 2026), that decision overreads the precedent it relies on. In the cited cases, the government faced an obvious, tangible injury; in *Wyandotte Transp. Co. v. United States*, 389 U.S. 191 (1967), the United States incurred costs to remove a sunken vessel in an inland waterway, while in *United States v. Supreme Court*, 839 F.3d 888, at 896 (10th Cir. 2016), a state professional conduct rule "worked to the detriment of federal prosecutors" by limiting their evidence-gathering abilities, *id.* at 900. Likewise, *Arizona v. United States*, 567 U.S. 387 (2012) was replete with articulable concerns that state commandeering of federal immigration law—rife with multiple layers of fact-specific and discretionary determinations about removal or other penalties—would cause actual harm to the Government's ability to establish a coherent national immigration policy and maintain a united front with respect to foreign relations, *see id.* at 409-10. To be clear, *Arizona* says that states may not regulate fields clearly

9

occupied by federal law. *Id.* at 399. But in that sense, *Arizona* does no more than reiterate a basic premise of Supremacy Clause jurisprudence. It says nothing about the federal government being injured *inherently* by a preempted state law, and, indeed, does not contain the word "standing." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119 (1984) (where jurisdiction was assumed *sub silentio*, "this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us").

CFTC makes no showing of concrete and particularized injury here. It cannot do so, because Connecticut's efforts *actively support* federal objectives. CFTC's own duly promulgated regulation at 17 C.F.R. § 40.11 outright prohibits "list[ing] for trading or accept[ing] for clearing" any contract "that involves, relates to, or references…gaming…or an activity that is unlawful under any State or Federal law. *Id.* § 40.11(a)(1). To repeat: *federal law clearly prohibits gaming contracts on federal commodities exchanges.* While "gaming" is undefined, the D.C. District Court correctly interpreted it as including contracts on the outcome of sporting events. *KalshiEX LLC v. CFTC*, No. 23-cv-3257 (JMC), 2024 U.S. Dist. LEXIS 163925, at *21-22, 37 (Sept. 12, 2024), *voluntarily dismissed*, 24-5205 (D.C. Cir. May 7, 2025). It is incomprehensible how any State effort to police sports wagering that is both unlicensed and illegal under Connecticut law *and* violates a clear, valid federal regulation could "directly interfere" with CFTC's authority in any respect. In sum, it appears that what chafes the current CFTC is its own regulation, not any state-imposed limitation or harm to its lawful authority.

Third, the Complaint's reliance on the Supremacy Clause itself fails to establish an injury in fact. The Complaint alleges that the challenged statutes "must yield" and are "without effect" under the Supremacy Clause. Compl. ¶ 67. But without more, a bald claim of preemption is insufficient to demonstrate injury to CFTC. The Supremacy Clause "instructs courts what to do when state and federal law clash"; it "does not create a cause of action," *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 325 (2015). Of course it does not. If every federal preemption question injured the federal government, that would create a gaping exception to Article III's standing requirement and, absurdly, permit, if not *require*, the Government's involvement in all preemption litigation. *See United States v. California*, No. 2:25-cv-06230, 2026 U.S. Dist. LEXIS 61221, at *11-12 (C.D. Cal. Mar. 18, 2026) at 11 ("Surely the limited resources of the United States Attorney's Office would be better expended prosecuting violations of federal criminal laws and protecting federal civil rights than, say, weighing in on whether federal law preempts state law false advertising claims concerning toothpaste packaging").

Equating alleged preemption with harm to the Government would also encourage the Government to wield declaratory judgment suits like this one as a cudgel to neutralize State laws *ex ante* simply because they do not align with the Government's current policies. *California*, 2026 U.S. Dist. LEXIS 61221, at *11-12. Relatedly, such a preemption-as-injury theory would also invite abstract and overly broad judicial rulings on important structural or constitutional issues, encouraging abuse of the judicial process. *United States v. Mattson*, 600 F.2d 1295, 1300 (9th Cir. 1979). *See also B.B. v. Hochul*, 166 F.4th 259, 271 (2d Cir. 2026) ("By limiting the judicial power to cases or

11

controversies, Article III confines the federal courts to a properly judicial role") (cleaned up). The fundamental requirement that the plaintiff have a particularized injury enables it to provide an "authoritative[]" and "complete" presentation of the "adverse consequences flowing from the specific set of facts." *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 221 (1973). Any lesser standing requirement would expand the Judiciary's role beyond cases and controversies and into abstract policy and regulatory decisions reserved for Congress.

Fourth, and finally, the Declaratory Judgment Act, 28 U.S.C. § 2201, provides no independent basis for jurisdiction. The CFTC's Complaint fails to allege a "case of actual controversy" and/or that it is an "interested party" for purposes of the Declaratory Judgment Act, 28 U.S.C. § 2201(a). *See MedImmune v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment"). Just as the CFTC fails to allege an injury in fact, it also fails to allege a direct, immediate, and real legal interest in the State's enforcement of the challenged statutes, and therefore does not enjoy standing under the Declaratory Judgment Act.

In sum, CFTC does not, and cannot, establish that it will suffer an injury in fact if Connecticut enforces State law as to unlawful gambling occurring on commodities exchanges.

12

II.      **CFTC fails to establish that any potential injury is caused by, and/or redressable by a judgment against, Defendants State of Connecticut, Governor Lamont, "Connecticut Department of Consumer Protection, Gaming Division," and Kristofer Gilman.**

Although CFTC's failure to demonstrate an injury in fact means no further analysis is necessary, this action must also be dismissed in significant part because CFTC cannot establish the causation and/or redressability elements of Article III standing as to most of the defendants. That is, it cannot establish a connection between Defendants and the enforcement of the challenged statutes such that a ruling against those defendants could redress any claimed injury. At this time, and for the purposes of this Motion only, Defendants do not contend that Defendants Cafferelli and Tong lack enforcement authority over the statutes addressed in Count III of the Complaint, but the remainder of the Complaint as to the other defendants must be dismissed on this basis.

CFTC must establish that the conduct from which it seeks relief is "fairly traceable" to, and "likely to be redressed by a favorable ruling" against, each defendant. *Doe v. Hochul*, 139 F.4th 165, 184 (2d Cir. 2025). *See Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (noting "standing is not dispensed in gross," and plaintiff must "demonstrate standing for each claim they press against each defendant…and for each form of relief they seek") (cleaned up). "This threshold requires a showing that each defendant caused his injury and that an order of the court against each defendant could redress the injury." *United States v. Walz*, No. 25-cv-2668, 2026 U.S. Dist. LEXIS 65486, at *7 (D. Minn. Mar. 27, 2026). *See also Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) ("The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute").

13

Courts have compared this analysis to the *Ex Parte Young* exception for Eleventh Amendment immunity, recognizing that Article III's requirement of a causal connection between the defendant and the injury and *Ex Parte Young*'s "some connection" requirement "are related," *Digital Recognition Network, Inc.*, 803 F.3d at 957. *See also, e.g. Walz*, 2026 U.S. Dist. LEXIS 65486, at *8 n.4 (listing cases). "[T]he official being sued must have (1) a particular duty to enforce the law in question and (2) a demonstrated willingness to exercise that duty." *We the Patriots USA, Inc. v. Lamont*, No. 3:23-cv-00737 (KAD), 2024 U.S. Dist. LEXIS 51190, at *6 (D. Conn. Mar. 22, 2024); *see also Grant v. Lamont*, No. 3:22-cv-01223 (JBA), 2023 U.S. Dist. LEXIS 147954, at *4 (D. Conn. Aug. 23, 2023) (same). A "particular duty to enforce the law in question" is distinguishable from general enforcement power. *See Connecticut Assn. of Health Care Facilities v. Rell*, No. 3:10-CV-136 (PCD), 2010 U.S. Dist. LEXIS 54649, at *16 (D. Conn. June 2, 2010) ("General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law."); *Cinicola v. Lamont*, No. 3:25-CV-493 (VDO), 2026 U.S. Dist. LEXIS 592, at *11 (D. Conn. Jan. 5, 2026) (same).

Here, CFTC has sued: the State of Connecticut; Governor Ned Lamont; Attorney General William Tong; DCP Commissioner Bryan Cafferelli; "Connecticut Department of Consumer Protection, Gaming Division"; and Kristofer Gilman, the Director of DCP's Gaming Division, in their official capacities. With the exception of Attorney General Tong and Commissioner Cafferelli as to Count III, no defendant has the requisite responsibility to enforce the challenged statutes such that a judgment against such defendant could redress any alleged harm.

14

*The State of Connecticut and Governor Lamont—All Counts.* At the outset, CFTC fails to allege a sufficient connection between Governor Lamont or the State of Connecticut and the enforcement of any of the challenged statutes, requiring dismissal of all three counts as to those defendants.

As to Governor Lamont, while CFTC alleges that the Connecticut Constitution vests him with "the supreme executive power of the state," and requires that he "take care that the laws be faithfully executed," Compl. ¶ 17 (citing Conn. Const. art. IV, §§ 5 & 12), this general description of the executive power is insufficient to establish a specific connection to the enforcement of any particular law. "'The mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute.'" *Conn. Ass'n of Health Care Facilities*, 2010 U.S. Dist. LEXIS, at *16, quoting *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979). *See also Cinicola*, 2026 U.S. Dist. LEXIS 592, at *11 (plaintiff failed to allege Governor Lamont had connection to enforcement of parole statute); *Conn. State Police Union v. State Dep't of Emergency Servs. & Pub. Prot.*, No. HHD-CV11-6024776, 2012 Conn. Super. LEXIS 152, at *8 (Jan. 13, 2012) (State Constitution's "take care" clause not a basis for action against governor for violation of rights).

Similarly, CFTC fails to demonstrate that a judgment against the State of Connecticut itself would likely provide redress for any alleged harm. If a ruling against a state's governor is not sufficient to secure redress from enforcement of a given state law, even less sufficient is a ruling against the State itself, as purely a political entity that cannot act except through its executive, legislative, or judicial officials. *See Columbia Air*

15

*Servs. v. DOT*, 293 Conn. 342, 349 (2009) ("the state can act only through its officers and agents"). In other words, the "State of Connecticut" does not enforce laws—its law enforcement officials do.

Thus, the entire Complaint must be dismissed as to Governor Lamont and the State of Connecticut.

### Connecticut Department of Consumer Protection, Gaming Division and Kristofer Gilman--All Counts

Similarly, the Complaint fails to establish that either "Connecticut Department of Consumer Protection, Gaming Division" or Kristofer Gilman as its Director has relevant enforcement responsibility or the ability to provide redress. The Gaming Division is an organizational unit within DCP, not a "regulatory and law enforcement agency," Compl. ¶ 20, and as a matter of law has no enforcement authority beyond that delegated by the Commissioner of Consumer Protection. *See* Conn. Gen. Stat. § 21a-1(a) ("There shall be a Department of Consumer Protection which shall be under the direction and supervision of a Commissioner of Consumer Protection…"); Conn. Gen. Stat. § 12-562(a) ("the commissioner shall have power to enforce the provisions of this chapter and chapter 226b," and "shall have power generally to do whatever is reasonably necessary for the carrying out of the intent of this chapter"). Compare this general grant of subject-matter authority with, *e.g.*, General Statutes § 21a-3b, which specifically establishes a Cannabis Control Division and provides, *e.g.*, that "[t]he division shall be authorized to conduct any investigation authorized," "may enter into mutual assistance and cooperation agreements," and "shall organize and conduct comprehensive compliance initiatives." Because DCP's Gaming Division has no independent statutory

16

authority to enforce any relevant laws apart from the Commissioner, it likewise has no separate ability to afford relief in the event of a judgment against it.

Thus, the entire Complaint must be dismissed as against "Department of Consumer Protection, Gaming Division" and Kristofer Gilman.

*All Defendants—Count I:* Count I challenges the application of General Statutes § 52-553, a general civil statute voiding wagers, contracts, and securities relating to illegal gambling. Section 52-553 simply addresses the enforceability of unlawful gambling contracts as a matter of State public policy; it lacks any enforcement mechanism for the State. While the cease and desist letters referenced § 52-553, they simply (and accurately) stated that sports wagering contracts like Kalshi's are void under its provisions. A hypothetical injury arising from enforcement of § 52-553 could not be redressed by a decision against any defendant, any more than could an injury arising from application of the statute of frauds, codified in neighboring § 52-550.

Thus, Count I must be dismissed as against all remaining Defendants.

*All Defendants—Count II:* Count II challenges General Statutes § 53-278b, which criminalizes "gambling" and "professional gambling" as defined by § 53-278a. Defendants have no enforcement authority as it pertains to these criminal statutes because, as a matter of State Constitutional law, no defendant is responsible for the investigation and prosecution of crimes in Connecticut. Conn. Const. Art. XXIII.[3] CFTC has not alleged—nor could it—that any defendant is required or even permitted to prosecute violations of § 53-278a (nor, for that matter, that any Connecticut prosecutor

---

[3] While the Chief State's Attorney may designate Assistant Attorneys General as special prosecutors, that designation expressly excludes prosecutions for any violations of Title 53, where the criminal gambling statutes fall. Conn. Gen. Stat. § 51-285(b).

has threatened to enforce the criminal gaming laws against any CFTC-regulated contract market). While the cease and desist letters referred to General Statutes § 53-278b, they simply indicated DCP's view that the DCMs' actions "are in violation" thereof, Ex. A at 1, and that "criminal penalties" may result, *id.* at 2; they do not threaten criminal action *by* DCP or any other defendant, nor could they.

As a result, Count II must also be dismissed as to all remaining Defendants.

*Count III:* Finally, Count III challenges the portions of Connecticut's sports wagering statute that establish an exception to criminal liability for licensed sports wagering, specifically General Statutes §§ 12-850 and 12-857. Compl. ¶¶ 77-83, 90-94. Section 12-850 merely defines "sports wagering," among other definitions pertaining to licensing and regulation of online casino gaming, fantasy contests, Keno, and online sale of lottery tickets. Section 12-857 requires online gaming operators providing services to the State's master wagering licensees to be licensed by the Department of Consumer Protection. At this time, and for the purposes of this Motion only, Defendants do not contend that Defendants Cafferelli and Tong lack enforcement authority over these provisions. But, for the reasons established above, no other defendant has such authority and therefore an ability to provide redress.

## CONCLUSION

Because CFTC lacks standing, the Court lacks subject matter jurisdiction and must dismiss its Complaint.

18

Respectfully submitted,

**DEFENDANTS**

STATE OF CONNECTICUT
NED LAMONT
WILLIAM TONG
BRYAN CAFFERELLI
CONNECTICUT DEPARTMENT OF
    CONSUMER PROTECTION, GAMING
    DIVISION
KRISTOFER GILMAN

**WILLIAM TONG**
**ATTORNEY GENERAL**

BY: */s/    Joseph E. Gasser*
    Joseph E. Gasser, No. ct30299
    Michael Nunes, No. ct31522
    Assistant Attorneys General
    Office of the Attorney General
    165 Capitol Avenue
    Hartford, CT 06106
    Phone: 860-808-5400
    Fax: 860-808-5593
    joseph.gasser@ct.gov
    michael.nunes@ct.gov

# EXHIBIT A



# STATE OF CONNECTICUT
*DEPARTMENT OF CONSUMER PROTECTION*

December 2, 2025

**<u>Via Certified Mail and E-Mail</u>**

KalshiEX LLC
594 Broadway #407
New York, NY 10012

Case No. 2025-77

To Whom it May Concern:

The Department of Consumer Protection ("Department") has become aware that KalshiEX LLC, d/b/a Kalshi ("Kalshi"), is conducting unlicensed online gambling, more specifically sports wagering, in Connecticut through its online sports event contracts ("Contracts"). Kalshi's actions are in violation of Connecticut General Statutes (Conn. Gen. Stat.) §§ 53-278b, 53-278d, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA"). The Department, therefore, orders Kalshi to immediately cease and desist advertising and offering its Contracts to Connecticut residents.

Conn. Gen. Stat. § 53-278b prohibits gambling and professional gambling. Gambling is defined as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device . . . ."  Conn. Gen. Stat. § 53-278a. Professional gambling means "accepting or offering to accept, for profit, money, credits, deposits or other things of value risked in gambling . . . ." Id.

Sports wagering is a form of gambling and is defined as:
> [R]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform, and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event, or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events.

Conn Gen. Stat. § 12-850(34).

Kalshi's platform allows users to purchase Contracts based on their belief that a particular sport outcome will occur, such as a specific team winning a game, division, or championship. The user is paid based on the outcome of the sporting event and not based on the occurrence or nonoccurrence of such event.  These Contracts constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events.



# STATE OF CONNECTICUT
*DEPARTMENT OF CONSUMER PROTECTION*

Public Act 21-23 authorized online sports gambling in Connecticut, but only for specific licensed entities. Kalshi does not possess an online gaming operator's license under Conn. Gen. Stat. § 12-857 or any other relevant qualification that would allow Kalshi to provide online gaming to Connecticut residents; nor do Kalshi's actions fall within any of the excepted activities to the prohibition on gambling listed in Conn. Gen. Stat. § 53-278g. Even if Kalshi possessed an online gaming operator's license, Kalshi's Contracts still violate numerous other Connecticut laws and public policies in that Kalshi allows for individuals under 21 years of age to place wagers and allows illegal wagers on Connecticut intercollegiate teams. Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30).

Moreover, Kalshi's Contracts are void under Conn. Gen. Stat. 52-553, which prohibits wagering contracts. More specifically, Section 52-553 states:

> All wagers, and all contracts and securities of which the whole or any part of the consideration is money or other valuable thing won, laid or bet, at any game, horse race, sport or pastime, and all contracts to repay any money knowingly lent at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers, shall be void . . . .

Kalshi's Contracts likewise fail to meet any of the exemptions of Conn. Gen. Stat. § 52-553.

Kalshi's promotion of unlicensed and illegal gambling services is also an unfair trade practice, which violates CUTPA. Not only are Kalshi's actions deceptive, they are also unfair in that Kalshi, by operating outside of the regulatory environment, is able to gain a competitive advantage over appropriately licensed entities.

Kalshi is hereby ordered to immediately cease and desist advertising, offering, promoting, or otherwise making available Contracts or any other form of unlicensed online gambling to Connecticut residents. Kalshi must, however, allow all Connecticut residents to withdraw any funds currently held by Kalshi. Failure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d.

Sincerely,

Kristofer Gilman
Director of Gaming



# STATE OF CONNECTICUT
*DEPARTMENT OF CONSUMER PROTECTION*

December 2, 2025

**Via Certified Mail and E-Mail**

Foris DAX Asia Pte. Ltd. d/b/a Crypto.com
1111 Brickell Ave, Suite 2725
Miami, FL 33131-3128

Case No. 2025-324

To Whom it May Concern:

The Department of Consumer Protection ("Department") has become aware that Foris DAX Asia Pte. Ltd., d/b/a Crypto.com ("Crypto"), is conducting unlicensed online gambling, more specifically sports wagering, in Connecticut through its online sports event contracts ("Contracts"). Crypto's actions are in violation of Connecticut General Statutes (Conn. Gen. Stat.) §§ 53-278b, 53-278d, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA"). The Department, therefore, orders Crypto to immediately cease and desist advertising and offering its Contracts to Connecticut residents.

Conn. Gen. Stat. § 53-278b prohibits gambling and professional gambling. Gambling is defined as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device . . . ."  Conn. Gen. Stat. § 53-278a. Professional gambling means "accepting or offering to accept, for profit, money, credits, deposits or other things of value risked in gambling . . . ." Id.

Sports wagering is a form of gambling and is defined as:
> [R]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform, and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event, or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events.

Conn Gen. Stat. § 12-850(34).

Crypto's platform allows users to purchase Contracts based on their belief that a particular sport outcome will occur, such as a specific team winning a game, division, or championship.  The user is paid based on the outcome of the sporting event and not based on the occurrence or nonoccurrence of such event.  These Contracts constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events.



# STATE OF CONNECTICUT
*DEPARTMENT OF CONSUMER PROTECTION*

Public Act 21-23 authorized online sports gambling in Connecticut, but only for specific licensed entities. Crypto does not possess an online gaming operator's license under Conn. Gen. Stat. § 12-857 or any other relevant qualification that would allow Crypto to provide online gaming to Connecticut residents; nor do Crypto's actions fall within any of the excepted activities to the prohibition on gambling listed in Conn. Gen. Stat. § 53-278g.  Even if Crypto possessed an online gaming operator's license, Crypto's Contracts still violate numerous other Connecticut laws and public policies in that Crypto allows for individuals under 21 years of age to place wagers and allows illegal wagers on Connecticut intercollegiate teams. Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30).

Moreover, Crypto's Contracts are void under Conn. Gen. Stat. 52-553, which prohibits wagering contracts.  More specifically, Section 52-553 states:

> All wagers, and all contracts and securities of which the whole or any part of the consideration is money or other valuable thing won, laid or bet, at any game, horse race, sport or pastime, and all contracts to repay any money knowingly lent at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers, shall be void . . . .

Crypto's Contracts likewise fail to meet any of the exemptions of Conn. Gen. Stat. § 52-553.

Crypto's promotion of unlicensed and illegal gambling services is also an unfair trade practice, which violates CUTPA. Not only are Crypto's actions deceptive, they are also unfair in that Crypto, by operating outside of the regulatory environment, is able to gain a competitive advantage over appropriately licensed entities.

Crypto is hereby ordered to immediately cease and desist advertising, offering, promoting, or otherwise making available Contracts or any other form of unlicensed online gambling to Connecticut residents.  Crypto must, however,  allow all Connecticut residents to withdraw any funds currently held by Crypto. Failure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d.

Sincerely,

Kristofer Gilman
Director of Gaming



# STATE OF CONNECTICUT
*DEPARTMENT OF CONSUMER PROTECTION*

December 2, 2025

**Via Certified Mail and E-Mail**

Robinhood Derivatives, LLC
85 Willow Road
Menlo Park, CA 94025

Case No. 2025-336

To Whom it May Concern:

The Department of Consumer Protection ("Department") has become aware that Robinhood Derivatives, LLC ("Robinhood"), is conducting unlicensed online gambling, more specifically sports wagering, in Connecticut through its online sports event contracts ("Contracts"). Robinhood's actions are in violation of Connecticut General Statutes (Conn. Gen. Stat.) §§ 53-278b, 53-278d, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA"). The Department, therefore, orders Robinhood to immediately cease and desist advertising and offering its Contracts to Connecticut residents.

Conn. Gen. Stat. § 53-278b prohibits gambling and professional gambling. Gambling is defined as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device . . . ."  Conn. Gen. Stat. § 53-278a. Professional gambling means "accepting or offering to accept, for profit, money, credits, deposits or other things of value risked in gambling . . . ." Id.

Sports wagering is a form of gambling and is defined as:
> [R]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform, and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event, or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events.

Conn Gen. Stat. § 12-850(34).

Robinhood's platform allows users to purchase Contracts based on their belief that a particular sport outcome will occur, such as a specific team winning a game, division, or championship.  The user is paid based on the outcome of the sporting event and not based on the occurrence or nonoccurrence of such event.  These Contracts constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live sporting event including future events.



# STATE OF CONNECTICUT
*DEPARTMENT OF CONSUMER PROTECTION*

Public Act 21-23 authorized online sports gambling in Connecticut, but only for specific licensed entities. Robinhood does not possess an online gaming operator's license under Conn. Gen. Stat. § 12-857 or any other relevant qualification that would allow Robinhood to provide online gaming to Connecticut residents; nor do Robinhood's actions fall within any of the excepted activities to the prohibition on gambling listed in Conn. Gen. Stat. § 53-278g.  Even if Robinhood possessed an online gaming operator's license, Robinhood's Contracts still violate numerous other Connecticut laws and public policies in that Robinhood allows for individuals under 21 years of age to place wagers and allows illegal wagers on Connecticut intercollegiate teams. Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30).

Moreover, Robinhood's Contracts are void under Conn. Gen. Stat. 52-553, which prohibits wagering contracts.  More specifically, Section 52-553 states:

> All wagers, and all contracts and securities of which the whole or any part of the consideration is money or other valuable thing won, laid or bet, at any game, horse race, sport or pastime, and all contracts to repay any money knowingly lent at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers, shall be void . . . .

Robinhood's Contracts likewise fail to meet any of the exemptions of Conn. Gen. Stat. § 52-553.

Robinhood's promotion of unlicensed and illegal gambling services is also an unfair trade practice, which violates CUTPA. Not only are Robinhood's actions deceptive, they are also unfair in that Robinhood, by operating outside of the regulatory environment, is able to gain a competitive advantage over appropriately licensed entities.

Robinhood is hereby ordered to immediately cease and desist advertising, offering, promoting, or otherwise making available Contracts or any other form of unlicensed online gambling to Connecticut residents.  Robinhood must, however,  allow all Connecticut residents to withdraw any funds currently held by Robinhood. Failure to comply may result in additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d.

Sincerely,

Kristofer Gilman
Director of Gaming

# EXHIBIT B

CFTC Letter No. 25-36    Advisories    September 30, 2025



**U.S. COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581
www.cftc.gov

CFTC Staff Advisory
Market Participants Division
Division of Market Oversight
Division of Clearing and Risk

September 30, 2025

**To:    All Futures Commission Merchants ("FCMs"), Introducing Brokers ("IBs"), Designated Contract Markets ("DCMs"), Derivatives Clearing Organizations ("DCOs"), and Registered Futures Associations ("RFAs")**

**Re:    Certain Contract Markets**

Ladies and Gentlemen:

The Market Participants Division ("**MPD**"), Division of Market Oversight ("**DMO**"), and Division of Clearing and Risk ("**DCR**" and, together with MPD and DMO, the "**Divisions**") of the Commodity Futures Trading Commission ("**CFTC**" or "**Commission**") are issuing this letter in connection with a potential lapse in government appropriations to advise FCMs, IBs, DCMs, DCOs, and RFAs to be prepared for all foreseeable conditions that may result from facilitating the trading and clearing of sports-related event contracts for customers, market participants, and clearing members.[1]

The Divisions are aware that certain registered entities and registrants are listing or facilitating the trading or clearing of sports-related event contracts, or may be interested in the future in doing so, and that there are market participants interested in trading these products.  The Divisions are also aware of

---

[1] *See* CFTC Press Release No. 9046-25, *CFTC Announces Prediction Markets Roundtable* (Feb. 5, 2025), *available at* https://www.cftc.gov/PressRoom/PressReleases/9046-25.

various forms of State regulatory actions[2] and pending and potential litigation concerning the legality of sports-related event contracts listed on DCMs.[3]

The Divisions are issuing this Advisory to caution FCMs, IBs, DCMs, and DCOs that State regulatory actions and pending and potential litigation, including enforcement actions, should be accounted for with appropriate contingency planning, disclosures, and risk management policies and procedures.[4] The Divisions note that FCMs, IBs, DCMs, and DCOs should be prepared to identify such contingency plans, disclosures, and risk management policies and procedures as part of the routine registration, oversight, and examination activities of the CFTC and applicable self-regulatory organizations, including monitoring legal developments and have risk mitigation and contingency plans in place to deal with any developments that may affect customer, market participant, or clearing member positions and funds.

FCMs, IBs, DCMs, and DCOs should provide customers, market participants, and clearing members with regularly updated information, including information based on any States in which they operate or engage in activity, to ensure that such customers, market participants, and clearing members understand the possible effects should State regulatory actions or ongoing or new litigation, including enforcement actions, result in termination of sports-related event contract positions. Among other things, FCMs and DCOs should ensure that their customers and clearing members are aware of liquidation or close-out policies and procedures that the FCM or DCO may deploy for sports-related event contracts as well as how the FCM or DCO will handle any necessary disposition of customer or clearing member funds and property.

---

[2] *See, e.g.,* Illinois Gaming Board, *Cease and Desist Letters Related to Unlicensed Sports Wagering Activity, available at* https://igb.illinois.gov/sports-wagering/cease-and-desist-letters.html (accessed Sept. 5, 2025); *OH Regulator Warns Sportsbooks about Wading Too Deep into Sports Contracts*, SBC Americas (Aug. 25, 2025), *available at* https://sbcamericas.com/2025/08/25/ohio-sports-contracts-letter/.

[3] For example, at least one federal district court has found that the Commodity Exchange Act ("CEA") does not preempt the application of State gambling, wagering, and gaming laws to sports-related event contracts listed and traded on a CFTC-registered trading venue. *See KalshiEX LLC v. Martin*, No. 25-CV-1283-ABA, 2025 WL 2194908 (D. Md. Aug. 1, 2025), on appeal to the U.S. Court of Appeals for the Fourth Circuit, Case No. 25-1892. *See also KalshiEX LLC v. CFTC*, No. 23-cv-3257, 2024 WL 4164694 at *8 (D.D.C. Sept. 12, 2024) ("The Court finds no reason to stray from the ordinary definitions of 'gaming,' which are 'the practice or activity of playing games' and 'playing games for stakes.'").

[4] The Commission has not, to date, been requested to take or taken any official action to approve the listing for trading of sports-related event contracts on any DCM pursuant to sections 5c(c)(4)-(5) of the CEA and Commission regulation 40.3. 7 U.S.C. § 7a-2(c)(4)-(5), 17 CFR 40.3. *See also* 17 CFR 38.4(a). All sports-related event contracts that are currently listed for trading on DCMs have been listed pursuant to self-certifications filed by the relevant DCM pursuant to CEA section 5c(c)(1) and Commission regulation 40.2, 7 U.S.C. § 7a-2(c)(1).17 CFR 40.2, and the Commission has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under CEA section 5c(c)(5)(C)(i), 7 U.S.C. § 7a-2(c)(5)(C)(i), or Commission regulation 40.11(a), 17 CFR 40.11(a). The activities enumerated under CEA section 5c(c)(5)(C)(i) and Commission regulation 40.11(a) are: activity that is unlawful under any Federal or State law; terrorism; assassination; war; and gaming. *See* Provisions Common to Registered Entities, 76 Fed. Reg. 44776, 44786 (July 27, 2011) ("[T]he Commission would like to note that its prohibition of certain 'gaming' contracts is . . . to 'protect the public interest from gaming and other event contracts.'") and at 44786, FN 35 ("[T]he Commission 'needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed event contracts.'"). Transactions subject to the Commission's jurisdiction "are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

FCMs are reminded that Commission regulation 1.55[5] prohibits an FCM from entering into a customer account agreement or accepting funds from a customer unless the FCM discloses to the customer all information about the FCM, including its business, operations, risk profile, and affiliates, that would be material to the customer's decision to entrust such funds to and otherwise do business with the FCM and that is otherwise necessary for full and fair disclosure.[6]  In particular, FCMs are reminded that Commission regulations require an FCM to disclose a summary of the FCM's current risk practices, controls and procedures,[7] expanding upon such information as necessary to keep such disclosure from being misleading, whether through omission or otherwise.[8]

FCMs are required to update such information as and when necessary to keep such information accurate and complete and to promptly disclose such updated information to all of its customers.[9]  In connection with such obligation to update information, an FCM must take into account any material change to its business operations, financial condition, and other factors material to a customer's decision to entrust the customer's funds and otherwise do business with the FCM since its most recent disclosure.[10]

FCMs are further reminded that each FCM is required to adopt policies and procedures reasonably designed to ensure that advertising and solicitation activities by each such FCM and any IBs associated with such FCM are not misleading to its customers in connection with their decision to entrust funds to and otherwise do business with such FCM.[11]

DCMs are reminded that certain statutory and regulatory requirements apply to providing complete and accurate information, and promoting transparency and fair and equitable trading.[12]  For example, DCMs are reminded that Commission regulation 38.401(b) provides that, with respect to any information required to be transmitted or made available to market participants and the public, including on the DCM's website or otherwise, the DCM must provide information that it believes, to the best of its knowledge, is accurate and complete, and must not omit material information.[13]

DCOs are reminded that Commission regulation 39.21 requires that a DCO must provide to market participants sufficient information to enable the market participants to identify and evaluate accurately the risks and costs associated with using the services of the DCO and must make information concerning the rules and the operating and default procedures governing the clearing and settlement systems of the DCO available to market participants.[14]

---

[5] 17 CFR 1.55.

[6] *See* 17 CFR 1.55(i).

[7] *See* 17 CFR 1.55(k)(11).

[8] *See* 17 CFR 1.55(i).

[9] *Id*.

[10] *Id*.

[11] *See* 17 CFR 1.55(l).

[12] Relevant requirements include but are not limited to: DCM Core Principle 4 (Prevention of Market Disruption), DCM Core Principle 7 (Availability of General Information), and DCM Core Principle 12 (Protection of Markets and Market Participants), as well as implementing regulations thereunder.

[13] 17 CFR 38.401(b).

[14] *See* 17 CFR 39.21(a) and (b).

Under the CEA and Commission regulations, persons are prohibited from engaging in regulated activities unless appropriately registered.[15]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This Advisory is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable by law by any party in any matter. This Advisory does not provide any no-action position with respect to a recommendation by any Division that the Commission initiate an enforcement action for failure to comply with the CEA or Commission regulations. Further, this Advisory is not intended to, does not, and may not be relied upon to create any new binding rules or regulations, or to amend existing rules or regulations. This Advisory represents only the views of the Divisions and does not necessarily represent the views of the Commission or of any other division or office of the Commission. Nothing in this Advisory is intended to waive any pre-decisional or other privileges that may apply to the Commission's or Divisions' deliberations or decision making regarding potential enforcement actions or potential rulemaking.

---

[15] *See, e.g.*, definitions of FCM and IB in Commission regulation 1.3, 17 CFR 1.3, sections 4d(a) and (g) of the CEA, 7 U.S.C. §§ 6d(a) and (g). *See also* frequently asked questions (FAQs) regarding registering an entity as a futures commission merchant, available at: https://www.cftc.gov/PressRoom/PressReleases/9091-25.

Questions concerning this Advisory may be directed to Thomas J. Smith, Acting Director, MPD, tsmith@cftc.gov, Rahul Varma, Acting Director, DMO, rvarma@cftc.gov or Richard Haynes, Acting Director, DCR, rhaynes@cftc.gov.

Sincerely,

_____

Thomas J. Smith
Acting Director
Market Participants Division

_____

Rahul Varma
Acting Director
Division of Market Oversight

_____

Richard Haynes
Acting Director
Division of Clearing and Risk